IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RON BERMAN                               :

                                         :

    v.                                   : Civil Action No. DKC 2002-3470

                                         :

CONGRESSIONAL TOWERS LIMITED
PARTNERSHIP - SECTION I, et al.:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this civil rights action alleging disability discrimination in housing are the motions by Defendants Congressional Towers Limited Partnership-Section I, Congressional Towers Limited Partnership-Section II, and Pollinger Company t/a Pollinger, Shannon & Luchs Company (collectively, "Defendants") (1) for summary judgment (Paper 110) and (2) to seal certain exhibits (Paper 109). The issues have been fully briefed and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the motion to seal will be granted, the motion for summary judgment will be granted as to count I, and the remaining state law claims in counts II and III will be remanded to the Circuit Court for Montgomery County.

**I.   Background**

**A.   *Factual Background***

The following facts are either uncontroverted or viewed in the light most favorable to Plaintiff Ron Berman.  Defendants

own, operate, and/or manage Congressional Towers, a residential apartment complex of over 600 units in four separate buildings. In early June 1999, Plaintiff visited Congressional Towers to apply for an available apartment.  While being shown apartment #405 in Building 261, Plaintiff informed a rental agent that "for medical reasons and health reasons, [he] had to avoid . . . exposures to chemicals." *See* Paper 110, Ex. 1 ("Berman Dep. I") at 129.  Specifically, Plaintiff testified:

> A.  I told her, when I looked at the apartment, that I had had a toxic exposure in my previous dwelling, and for medical reasons and health reasons, I had to avoid future exposures to chemicals.
>
> And I asked her – I said to her I wanted to be present before any work was done to the apartment so that I could ensure that no toxic chemicals would be used inside or near to the apartment, and I asked that they do not – the management do not paint the apartment and that they do not use any rug cleaner on the carpet.  And I said, Just leave the apartment the way it is.  And I asked them to accommodate me.
>
> Q.  Exactly that way?
>
> A.  Yes.
>
> Q.  You used exactly those words, quote/unquote?
>
> A.  Yes.

*Id*. at 129-30.  In addition, Plaintiff presented to a Congressional Towers employee a letter purporting to explain to

Defendants the "circumstances causing [him] to vacate [his] former dwelling." *See* Berman Dep. I at 133-36; Paper 110, Ex. 5.[1] After concluding that apartment #405 was suitable, Plaintiff entered into a Lease Agreement on July 1, 1999.

---

[1] In full, the letter read:

This explains the circumstances causing me to vacate my former dwelling.

I had resided there for over 9 years, established good credit with the utility company, and paid my rent on time every month.

In the fall of 98 the dwelling failed the section 8 inspection for windows as well as failing the county code requirements for windows.  The landlord had been told about the windows for many years.

The windows were replaced but a problem occurred involving the window caulking that was used. Consequently the dwelling became uninhabitable, and I was unable to live in the dwelling and I was unable to move my possessions out of the house.  An attorney advised me that I did not have to pay rent during the months the problem occurred, March, April, and May. Contrary to his advice, I decided it was in my best interest to pay the rent, late for April and May even though I was not living in the dwelling.  In no way was this because I was unable to pay, I felt it was unjustified given the sickening circumstances that had occurred.  The landlord made no attempt to correct the problem that had occurred.  The rent was paid on time for March.

Sincerely, Ronald Berman

P.S. See letter of Credit from Phone Company

*See* Paper 110, Ex. 5.

3

On December 30, 1999, Congressional Towers sent notices to residents of Building 261, including Plaintiff, that exterior renovations were set to begin on their building, and that residents should expect to see workers throughout the complex over the next couple of months. *See* Paper 110, Ex. 7. According to the notice, the work to be done included re-caulking around balcony doors, and scraping, priming, and painting all balconies. *Id*. Although this was part of a larger, on-going renovation project that had begun earlier that year on the other buildings at Congressional Towers, Plaintiff testified that he was unaware of any previous renovations taking place. Berman Dep. I at 159.

Despite receiving the notice on the evening of December 30, 1999, Plaintiff did not immediately complain to any staff, employee, or management of Congressional Towers. *Id*. On January 3, 2000, preparations for the renovation work began. Plaintiff testified that he observed workers wearing face or dust masks erecting scaffolding along the side of Building 261 and "working on the windows on the outside." He also testified to witnessing workers entering and exiting apartments inside the building, including some apartments on his floor. *Id*. at 170-74; Ex. 2 ("Berman Dep. II") at 43-45. Plaintiff admits, however, that he did not see any work taking place inside the

4

buildings, and that no work was being conducted on his apartment.  Concerned about the possible chemicals being used during the renovations, Plaintiff both called and visited the on-site manager's office to inform management that he must avoid exposure to any chemicals.  Berman Dep. I at 161–66.  Later that day, the apartment manager, Cheryl Stevens, returned Plaintiff's call.  Admitting that he did not go in to "great detail," he reiterated that he had to avoid exposure to chemicals.  Plaintiff testified that Ms. Stevens responded that the work was being supervised by engineers and that it was safe.  *Id*. at 168–69.  Although Plaintiff did not actually see any chemicals being used, he testified that he suspected they were because he began to experience "some pain in the arms and legs," discomfort in his eyes, and a "tightness in the throat and some difficulty swallowing."  Berman Dep. II at 85–86.  He also testified that the "hallways reeked of an odor," which he described as a "solvent or some kind of chemical."  *Id*. at 92–93.

Not satisfied with Ms. Stevens' response, the next day, January 4, 2000, Plaintiff presented for the first time a letter from his doctor explaining that he was "chemically sensitive" and that he must not be exposed to a variety of substances, many of which are contained in "paints, repair or construction materials, pesticides, [and] carpets."  Paper 110, Ex. 8.  The

letter indicated that the list was not exhaustive and that
Plaintiff should be advised of any pending activity related to
his home.  *Id*.  At this point, Plaintiff requested that the
renovation work be halted.  Berman Dep. II at 83; Paper 115, Ex.
43 ("Stevens Dep.") at 118.  Although Ms. Stevens refused to
halt the work, and, according to Plaintiff, "became kind of
belligerent," she offered to move Plaintiff to another apartment
in a building that had already been renovated.  Berman Dep. II
at 66, 75-84; Stevens Dep. at 118.  Although Plaintiff could not
remember whether Ms. Stevens offered to move him to another
apartment on January 3 or January 4, it is undisputed that on
January 6 she sent Plaintiff a letter confirming her offer to
move him to another apartment in building 259 and stating that,
if after transferring he "should have health issues related to
the completed renovations of that building," Congressional
Towers would release him from his obligations under his lease.
*See* Paper 110, Ex. 9.  After January 3, the first day he
observed workers at the complex, Plaintiff no longer spent the
night in apartment #405.  Berman Dep. II at 27.

Although Ms. Stevens promptly offered to transfer Plaintiff
to another building, he did not accept the offer until at least
January 7 or January 8.  *See* Berman Dep. II at 69, 100.
Plaintiff testified that he did not immediately accept because

he was more concerned with moving his property out of his apartment, and transferring it to either storage or his father's house. *Id*. at 70. Before accepting the offer to move into another apartment, Plaintiff was given the opportunity to inspect it and ensure that it was satisfactory. *Id*. at 95–97. During that visit, he testified that he noticed a "strong odor" emanating from the apartment, and that there were "people cleaning the rugs" inside the apartment that informed him the smell was due to the cleaning. *Id*. Plaintiff admits that he did not ask these individuals how the carpet had been cleaned and what substances, if any, had been used. *Id*. at 98. He also testified that he does not know who the individuals were, nor whether they were Congressional Towers employees or independent contractors. *Id*. at 97–98. Despite the odor, Plaintiff did not complain to Ms. Stevens, did not inquire as to whether there was another apartment to which he could move, and did not request to be released from his lease. *Id*. at 104–105. On January 8, 2000, Plaintiff executed a lease for the apartment he inspected, #215 in Building 259, and on January 10, he moved his belongings that he had not already taken elsewhere into the second apartment. *See* Paper 110, Ex. 26; Berman Dep. II at 24–25.

When the smell had not dissipated by the following day, January 11, Plaintiff wrote a letter to Ms. Stevens indicating

that the second apartment "reeked of chemical odor" and claiming for the first time that he accepted her offer to move "reluctantly and under duress." *See* Paper 110, Ex. 10.  Because of his concern regarding the odor, Plaintiff never spent the night in the second apartment and visited it "very infrequent[ly]."  Berman Dep. II at 28.  However, even though Plaintiff considered apartment #215 to be "uninhabitable," and despite Ms. Stevens' offer to release him from his lease should he have health issues related to the second apartment, Plaintiff continued to use apartment #215 as a "storage facility" for approximately two more months.  Finally, in a letter dated February 29, 2000, Plaintiff requested to be released from his lease.  *See* Berman Dep. II at 55, 139-40; Paper 110, Exs. 11, 12.   There is no dispute that after Plaintiff asked to be released, Congressional Towers terminated the lease and fully refunded his security deposit.  *Id*. at 139.

### B.   *Procedural Background*

On December 27, 2001, Plaintiff filed suit in the Circuit Court for Montgomery County.  On September 17, 2002, Plaintiff filed a first amended complaint in that court, alleging disability discrimination in violation of the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3600 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.,* the

8

Maryland Human Rights Act, Md. Ann. Code art. 49B, and the Montgomery County Code.  Plaintiff asserts that he is disabled because of a condition referred to as Multiple Chemical Sensitivity ("MCS"), which causes a hyper-sensitivity to a multitude of chemicals, and that Defendants unlawfully discriminated against him by failing reasonably to accommodate his MCS.  Plaintiff also alleges two counts of common law negligence stemming from his alleged exposure to various chemicals used in the renovation and cleaning of Congressional Towers.  After Defendants removed the action to this court on the basis of federal question jurisdiction, *see* Paper 1, Plaintiff filed a second amended complaint, which, other than renumbering the counts and adding a few additional factual allegations, substantially mirrored his original complaint. *See* Paper 46.  Defendants now move for summary judgment on all counts.

## II.  Defendants' Motion to Seal

In addition to their motion for summary judgment, Defendants have filed an unopposed motion to seal Exhibits 14 and 24 provided in support of their motion for summary judgment.  In order to place the exhibits under seal, this court must determine "that the denial [of access] serves an important governmental interest and that there is no less restrictive way

to serve that governmental interest." *Rushford v. New Yorker Magazine*, 846 F.2d 249, 253 (4th Cir. 1988); *see also Padco Advisors, Inc. v. Omdahl*, 179 F.Supp.2d 600, 614 (D.Md. 2002). To make that determination, the court "must follow [certain] procedural requirements." *Rushford*, 846 F.2d at 253. "Under *Knight*, a court must first give the public notice of a request to seal and a reasonable opportunity to challenge it." *Stone v. Univ. of Maryland*, 855 F.2d 178, 181 (4th Cir. 1988) (citing *In re Knight Publishing Co.*, 743 F.2d 231, 235 (4th Cir. 1984)). Additionally, the court must "consider less drastic alternatives to sealing and, if it decides to seal documents, must 'state the reasons for its decision to seal . . ., and the reasons for rejecting alternatives to sealing in order to provide an adequate record for review.'" *Id.* (citing *Knight*, 743 F.2d at 235); *see also Media General Operations, Inc. v. Buchanan*, --- F.3d ---, 2005 WL 1798341 (4th Cir. 2005).

Defendants' motion to seal has been docketed and made available to the public since October 2004 (Paper 109), thereby providing sufficient notice under the requirements of *Knight* and *Stone*. *See Padco Advisors, Inc.*, 179 F.Supp.2d at 614. No objections to sealing these exhibits have been received. Moreover, the exhibits Defendants seek to seal contain

information pertaining to certain medical records, including the health care, diagnosis, and treatment of Plaintiff which both Maryland statutory and case law recognize as confidential. *See generally* Md. Code Ann., Health-Gen. I §§ 4-301 to 4-307 (2005); *Doe v. Maryland Bd. of Social Workers*, 840 A.2d 744, 750 (Md.Ct.Spec.App. 2004). The exhibits are relatively brief, and all relevant information is of a confidential nature. Thus, redaction would serve no purpose. Considering the nature of the information contained in the exhibits, and the fact that an ample time has passed without objection since the motion was filed, Defendants' motion to seal will be granted.

**III. Standard of Review**

It is well established that a motion for summary judgment will be granted only if there exists no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In other words, if there clearly exist factual issues "that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," then summary judgment is inappropriate. *Anderson*, 477 U.S. at 250; *see also Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987); *Morrison v.*

11

*Nissan Motor Co.*, 601 F.2d 139, 141 (4th Cir. 1987).  The moving party bears the burden of showing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law.  *See* Fed.R.Civ.P. 56(c); *Catawba Indian Tribe of South Carolina v. State of S.C.*, 978 F.2d 1334, 1339 (4th Cir. 1992), *cert. denied*, 507 U.S. 972 (1993).

When ruling on a motion for summary judgment, the court must construe the facts alleged in the light most favorable to the party opposing the motion.  *See United States v. Diebold*, 369 U.S. 654, 655 (1962); *Gill v. Rollins Protective Servs. Co.*, 773 F.2d 592, 595 (4th Cir. 1985).  A party who bears the burden of proof on a particular claim must factually support each element of his or her claim. "[A] complete failure of proof concerning an essential element . . . necessarily renders all other facts immaterial."  *Celotex Corp.*, 477 U.S. at 323.  Thus, on those issues on which the nonmoving party will have the burden of proof, it is his or her responsibility to confront the motion for summary judgment with an affidavit or other similar evidence in order to show the existence of a genuine issue for trial.  *See Anderson*, 477 U.S. at 256; *Celotex Corp.*, 477 U.S. at 324.  However, "[a] mere scintilla of evidence in support of the nonmovant's position will not defeat a motion for summary judgment."  *Detrick v. Panalpina, Inc.*, 108 F.3d 529, 536 (4th

12

Cir.), *cert. denied*, 522 U.S. 810 (1997).   There must be "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

## IV. Analysis

Defendants have moved for summary judgment on all counts. With respect to the claim of disability discrimination, Defendants argue, *inter alia*, that Plaintiff's alleged sensitivity to chemicals is not, as a matter of federal law, a disability, and, *assuming arguendo* that his condition is a disability, Defendants reasonably accommodated him.  As to the claims of negligence, Defendants argue that Plaintiff has failed to identify any duty breached by Defendants, and failed to put forth any objective evidence of causation or injury.  For the following reasons, Defendants' motion for summary judgment will be granted with respect to Plaintiff's claim of disability discrimination.  With the sole basis for this court's subject matter jurisdiction no longer present, the court will decline to exercise supplemental jurisdiction over counts II and III, and will remand this action to the Circuit Court for Montgomery County.

A.   *Disability Discrimination (Count I)*[2]

The Fair Housing Act (FHA) makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person." 42 U.S.C. § 3604(f)(2)(A). Discrimination is defined to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id*. § 3604(f)(3)(B); *see Bryant Woods Inn, Inc. v. Howard County, Maryland*, 124 F.3d 597, 603 (4th Cir. 1997). Thus, to make out a claim of discrimination based on a failure to make reasonable

_____

[2] Although Plaintiff originally brought his claim of disability discrimination under both the Fair Housing Act (FHA) and the Americans with Disabilities Act (ADA), he concedes in his opposition that Congressional Towers, a private residential apartment complex, is not a "public accommodation" covered under the ADA. *See* 42 U.S.C. § 12181(7); *see also Independent Housing Servs. of San Francisco v. Fillmore Center Assocs.,* 840 F.Supp. 1328, 1344 (N.D.Cal. 1993) ("[A]partments and condominiums do not constitute public accommodations within the meaning of the Act."); H.R.Rep. No. 101-485(II), at 100 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303, 383 (explaining that "[o]nly nonresidential facilities are covered by" the ADA, and providing by way of example that "in a large hotel that has a residential apartment wing, the residential wing would be covered under the Fair Housing Act rather than by [the ADA.]") (internal citations omitted). Accordingly, summary judgment will be granted with respect to the ADA portion of Plaintiff's disability discrimination claim in count I.

accommodations, a plaintiff must demonstrate that: (1) he suffers from a handicap as defined by the FHA; (2) defendants knew or reasonably should have known of the plaintiff's handicap; (3) accommodation of the handicap "may be necessary" to afford plaintiff an equal opportunity to use and enjoy the dwelling; and (4) defendants refused to make such accommodation. *See, e.g., United States v. California Mobile Home Park Mgmt. Co.*, 107 F.3d 1374, 1380 (9th Cir. 1997); *Bentley v. Peace and Quiet Realty 2 LLC*, 367 F.Supp.2d 341, 345 (E.D.N.Y. 2005).

Defendants first argue that Plaintiff is not handicapped as defined by the FHA. Under the Act, "handicap" means, "with respect to a person--(1) a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) a record of having such an impairment, or (3) being regarded as having such an impairment." 42 U.S.C. § 3602(h). As stated above, Plaintiff alleges that he suffers from Multiple Chemical Sensitivity (MCS), a condition which causes him to experience severe physical reactions when exposed to various chemicals and irritants. Such reactions include chronic fatigue, headaches, confusion, and memory loss. *See* Berman Dep. I at 34; Berman Dep. III at 18-20; *see also* Paper 110, Ex. 8. In addition, Plaintiff claims that his condition can, and has, caused such effects as pain in the arms and legs,

discomfort in his eyes, tightness in the throat, and difficulty swallowing. Berman Dep. II at 85-86. Moreover, Plaintiff has presented evidence from a physician who has treated him on multiple occasions stating that Plaintiff suffers from MCS, and corroborating the adverse physical effects that Plaintiff may experience if exposed to certain chemicals and substances.

Defendants argue that Plaintiff is not disabled under applicable law because MCS is not a scientifically valid diagnosis under *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and because he has not identified any major life activities that are substantially impaired by his medical condition. They argue further that he has not proven that they had knowledge of the asserted disability. It will not be necessary to address these arguments, however, because, even assuming Plaintiff has a recognized and qualifying handicap about which Defendants had knowledge, the record is clear that Defendants did, indeed, attempt to make reasonable accommodations to Plaintiff, entitling them to summary judgment on count I.

Accommodations required under the FHA must be both reasonable and necessary to afford the handicapped individual an equal opportunity to use and enjoy a dwelling. *Bryant Woods*, 124 F.3d at 603. "Whether a requested accommodation is required

16

under the Act is highly fact-specific, requiring case-by-case determination." *Hubbard v. Samson Mgmt. Corp.,* 994 F.Supp. 187, 190 (S.D.N.Y. 1998) (internal quotations omitted); *see also Mobile Home,* 107 F.3d at 1380; *Lyons v. Legal Aid Society,* 68 F.3d 1512, 1516 (2nd Cir. 1995). Plaintiff bears the burden of demonstrating the reasonableness of a requested accommodation. *Bryant Woods,* 124 F.3d at 604; *see also Groner v. Golden Gate Gardens Apts.,* 250 F.3d 1039, 1045 (6th Cir. 2001); *Elderhaven, Inc. v. City of Lubbock,* 98 F.3d 175, 178 (5th Cir. 1996).

To determine whether a proposed accommodation is reasonable, courts generally balance the burdens imposed on the defendant by the benefits to the plaintiff. *Groner,* 250 F.3d at 1045; *Hubbard,* 994 F.Supp. at 190. This includes considering the accommodation's functional and administrative aspects, as well as its costs. *Bryant Woods,* 124 F.3d at 604. Although a landlord may be required to incur reasonable costs to accommodate a tenant's handicap, "[r]easonable accommodations do not require accommodations which impose undue financial and administrative burdens, or changes, adjustments, or modifications to existing programs that would be substantial, or that would constitute fundamental alterations in the nature of the program." *Id.* (internal quotations and citations omitted). Moreover, an accommodation need not extend a preference to

17

handicapped residents relative to other residents, as opposed to affording them equal opportunity. *Hubbard*, 994 F.Supp. at 190 (internal quotations and citations omitted). "In other words, accommodations that go beyond affording a handicapped tenant 'an equal opportunity to use and enjoy a dwelling' are not required by the Act." *Id*. (quoting *Bryant Woods*, 124 F.3d at 605).

Plaintiff identifies three distinct requests for accommodation that he argues were both reasonable and necessary. He asserts that Defendants rejected or failed to observe all three.  First, he argues that when he initially applied for an apartment in early June 1999, he informed Defendants of his handicap, i.e., his acute sensitivity to chemicals, and that he requested "advance notice of renovation work [that] was more than adequate to put defendants on notice that he was making a request for accommodation." Paper 112 at 17.  He contends that the letter he provided explaining why he vacated his previous apartment, his oral request that he be notified and present before any work is done to his Congressional Towers apartment, as well as the indication on his credit report that he was "disabled" adequately informed Defendants of the nature and severity of his handicap and the necessity of receiving advance notice of any potentially harmful work.  Defendants counter that the various pieces of information Plaintiff provided at that

18

time were too ambiguous and general to inform them sufficiently
of his health condition, or what precise accommodations and
needs he was requesting.  Obviously, without knowledge of an
individual's handicap or what accommodations he seeks, a
landlord cannot be said to have failed to provide such
reasonable accommodations.  *Cf. Felix v. New York City Transit
Authority*, 154 F.Supp.2d 640, 657 (S.D.N.Y. 2001) (observing in
the context of ADA employment cases that the "notice requirement
is rooted in common sense," and that "an employer who acts or
fails to act without knowledge of a disability cannot be said to
have discriminated based on that disability").

Although a close review of the evidence submitted suggests
Defendants' argument on this point has some merit, *see supra* at
I.A., resolution of the knowledge issue is largely academic.
The undisputed fact remains that on December 30, 1999,
Defendants did provide advance notice that exterior renovations
on the building in which Plaintiff resided were set to begin.
*See* Berman Dep. I at 159; Paper 110, Ex. 7.  Despite receiving
this notice, Plaintiff admits he did not contact Defendants to
express any concern or lodge any complaint.  He did not, for
example, inquire about when the work might begin, what it would
entail, how close it might be conducted to his apartment, and
what kind of chemicals might be used.  Moreover, he provides no

explanation as to why he did not, or could not, contact Defendants upon receiving this notice, or any other reason as to why the notice was not reasonable.  Rather it is undisputed that Plaintiff waited until January 3, 2000, after the renovations to the exterior of Building 261 had begun, to contact anyone at Congressional Towers to voice his concerns.  In sum, he provides no evidence to suggest that, to the extent he requested advance notice of any work in and around his apartment to accommodate his handicap, Defendants failed or refused to provide it.

Plaintiff next argues that his request on January 4, the day after the work had begun, that Defendants cease the renovation project was a necessary and reasonable accommodation that Defendants refused to honor.  The court cannot agree.  It is undisputed that the renovation work that began on Building 261 on January 3 was a smaller part of a larger on-going renovation project that had begun many months in advance of January 2000.  *See* Paper 110, Ex. 15 ("Secosky Dep. I") at 73-74.  According to the manager, Ms. Stevens, the renovation project was "part of [Defendants'] presentation" to lure prospective tenants to Congressional Towers.  *See* Paper 115, Ex. 43 (Stevens Dep.) at 143.  Defendants have submitted evidence of contracts, invoices, and work orders with third-party contractors and engineers for work totaling in the hundreds of thousands of dollars.  *See*

Paper 110, Exs. 16, 18, 23.  Plaintiff admits himself that by January 3, scaffolding was being erected on the exterior portions of Building 261 and the work was well underway. Plaintiff has put forth no evidence, nor made any persuasive arguments, that halting the work once it had begun was either a reasonable or necessary accommodation.

On the other hand, it is undisputed that perhaps as early as January 3, the day the work began and Plaintiff first contacted Congressional Towers management, but at least by January 4, the day Plaintiff presented a note from his doctor, Defendants offered Plaintiff an alternative apartment in a building where the exterior renovations had already been completed.  Rather than immediately accept Defendants' offer, Plaintiff chose to wait a number of days, until at least January 7 or 8, before he accepted.[3]  In addition, it is undisputed that Defendants informed Plaintiff that should he accept their offer, they would waive certain fees, allow him to resume his current lease length, and transfer his security deposit.  Paper 110, Ex. 9.  Moreover, they indicated that if, after transferring to a second apartment, he should have "health issues related to the

_____

[3] Although he gives no explanation as to why he did not immediately accept their offer, he indicates that he was spending his time during this period moving his possessions out of his apartment.  Berman Dep. II at 27.  Plaintiff does not claim that he requested in any form assistance from Defendants to help him move his belongings out of his first apartment.

completed renovations of that building," Plaintiff would be released from his obligations under his lease.  *Id*.  Finally, before Plaintiff accepted the offer, he was allowed to inspect the apartment to ensure that it was satisfactory.  Far from failing reasonably to accommodate Plaintiff, the undisputed facts convincingly demonstrate that Defendants were making a good faith effort to accommodate Plaintiff's handicap in order to afford him an equal opportunity to use and enjoy his housing.

Lastly, Plaintiff asserts that his third request for a reasonable accommodation was also denied by Defendants.  He identifies this last request as one for a "safe alternative apartment."  *See* Paper 112 at 17.  First, it should be noted that the offer to move into a second apartment was prompted not in response to a request by Plaintiff, but rather was freely made by Defendants in a good faith effort to address Plaintiff's concerns regarding the renovation work and to accommodate his handicap, of which by that time they were undoubtedly aware.  Moreover, as mentioned above, Plaintiff was given the opportunity to inspect the apartment by himself before accepting it in order to ensure that it was satisfactory.  Although Plaintiff claims that he noticed a strong odor emanating from the apartment, he admits that he did not inform Congressional Towers management of the odor when he returned the key, did not

complain that it was unsatisfactory, did not request to see another apartment, and, at that time, did not seek to be released from his lease, even though the latter was an option that he had been given.[4]  Rather, on January 8, 2000, he executed a new lease for the apartment he inspected, #215 in Building 259, and on January 10, he moved his belongings that he had not already taken elsewhere into the second apartment.  *See* Paper 110, Ex. 26; Berman Dep. II at 24-25.  Neither at the time he signed the lease, nor on the day he moved in, did Plaintiff express a concern about apartment #215.  In fact, it was not until the day after he had moved in, three days after signing his lease, that he informed Defendants that his second apartment "reeked of chemical odor."  *See* Paper 110, Ex. 110.  He also mentions for the first time in this letter that he accepted Defendants' offer to move into another apartment "under duress," an assertion that is belied by the facts that he was given an opportunity to inspect the apartment before he moved in, that neither Ms. Stevens nor any other managers, rental agents, or

---

[4]  Although Plaintiff testified that he "think[s] [he] made some mention of" the odor to a secretary in the leasing office when he returned the key, he testified that he did not know who it was, could not describe her, and had never spoken to her before.  Berman Dep. II at 102-03.  It is undisputed that he did not mention it to Ms. Stevens, the manager who had been dealing with Plaintiff, nor to "Cherie," the assistant manager in the office, nor any one else associated with Congressional Towers. *Id*. at 104.

other coercive parties were present when he inspected it, that he had the option at that point to terminate his lease, and that he ultimately accepted it without complaint. Moreover, Plaintiff does not claim that this was the only apartment to which they were willing to transfer him such that a kind of "take it or leave it" situation was created. In fact, there is evidence in the record that Plaintiff does not dispute indicating Defendants offered him his choice of at least two different apartments. *See* Paper 112, Ex. 31; Stevens Dep. at 118 ("I offered him two apartments right in the building directly across from him, in a building that had been through all the final renovations. It was completed, and there was no work being done in that building."). Additionally, it is undisputed that Plaintiff waited at least four days between the time he was offered a second apartment and the time he signed the lease, and an additional two days before he moved in. In short, Plaintiff's contention that he accepted the second apartment under duress is unavailing.

Finally, although Plaintiff informed Defendants of the odor coming from his second apartment in letters dated January 11 and January 25, he sought no additional accommodations from Defendants, and did not request to be released from his lease until the last day of February. *See* Paper 110, Exs. 10, 11, 12.

It is undisputed that after Plaintiff asked to be released,
Congressional Towers terminated the lease and fully refunded his
security deposit.   Berman Dep. II at 140.[5]   Accordingly, the
undisputed facts demonstrate that far from refusing reasonably
to accommodate Plaintiff's handicap, Defendants made a
concerted, good faith effort to accommodate Plaintiff consistent
with the requirements of the FHA.   Accordingly, Defendants are
entitled to summary judgment on Plaintiff's disability
discrimination claim.[6]

---

[5] Plaintiff also testified that even though the rent for the
second apartment was higher than for the first, Defendants did
not charge him the difference, further evidencing their good
faith efforts to accommodate him.   Berman Dep. II at 139

[6] Although Plaintiff does not explicitly allege a violation
of § 3617 of the FHA in his complaint, he asserts in his
opposition that Ms. Stevens violated this section when she
became "belligerent" when he initially complained about the
renovations and allegedly told him that Defendants were not
responsible for his "allergies."   *See* Paper 112 at 19; Berman
Dep. II at 82-85.   Section 3617 makes it unlawful for anyone to
"coerce, intimidate, threaten, or interfere with any person in
the exercise or enjoyment of . . . any right granted" under the
FHA.   42 U.S.C. § 3617.   Even assuming Ms. Stevens reacted the
way Plaintiff claims, it is undisputed that the same day, she
offered Plaintiff the option of moving into a different
apartment, giving him the chance to inspect it first, in order
to accommodate his MCS.   Perhaps Ms. Stevens should have
responded to Plaintiff in a more appropriate and respectful
manner.   "Section 3617 does not, however, purport to impose a
code of civility on those dealing with individuals who have
exercised their FHA rights."   *Sporn v. Ocean Colony Condominium
Ass'n*, 173 F.Supp.2d 244, 251 (D.N.J. 2001).   In light of the
above discussion, including Defendants' prompt, good faith
efforts reasonably to accommodate Plaintiff, his contention that
(continued...)

25

**B.   *Negligence (Counts II and III)***

Plaintiff also alleges two counts of negligence against Defendants: (1) stemming from the alleged harm suffered from the renovation work being done on Building 261 before he moved out; and (2) stemming from the alleged harm suffered from chemicals contained in carpet cleaner used in the second apartment.  With respect to both counts, Defendants argue that Plaintiff has failed to put forth any evidence of a "viable" duty breached by Defendants, nor has he supplied sufficient evidence that the conduct of Defendants was the proximate cause of his alleged injuries.  Because the court will grant summary judgment for Defendants on Plaintiff's disability discrimination claim, there no longer exists a federal question in this suit.  As the sole basis for removing this action to this court is no longer present, the court will decline to exercise supplemental jurisdiction over Plaintiff's negligence claims and remand this action to state court.  *See* Paper 1 (Notice of Removal), ¶ 4 (providing that subject matter jurisdiction existed pursuant to 28 U.S.C. § 1331); Paper 8 (Statement Concerning Removal), ¶ 3 (stating that "Removal was not predicated on diversity jurisdiction); Paper 46 (Second Amended Complaint), ¶¶ 3-5

---

[6](...continued)
they coerced, intimidated, threatened, or interfered with his exercising his FHA rights is unfounded.

(alleging that Plaintiff and all Defendants are citizens of Maryland).

Under the supplemental jurisdiction statute, 28 U.S.C. § 1367(c)(3), the court has discretion to decline exercising supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction . . . ." *See Bigg Wolf Discount Video Movie Sales, Inc. v. Montgomery County, Maryland*, 256 F.Supp.2d 385, 400-01 (D.Md. 2003). In *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966), the Supreme Court cautioned that "[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surerfooted reading of applicable law." The *Gibbs* Court went on to say that "if the federal law claims are dismissed before trial . . . the state claims should be dismissed as well." *Id.; see also Hinson v. Norwest Fin. South Carolina, Inc.*, 239 F.3d 611, 617 (4th Cir. 2001) ("[W]e conclude that under the authority of 28 U.S.C. § 1367(c), authorizing a federal court to decline to exercise supplemental jurisdiction, a district court has inherent power to dismiss the case or, in cases removed from State court, to remand, provided the conditions set forth in § 1367(c) for declining to exercise

supplemental jurisdiction have been met.").[7]  Here, the remaining
negligence claims asserted by Plaintiff raise potentially novel
and complex issues under Maryland law regarding the tort duty
owed by a landlord to a specific and particular tenant *vis-a-vis*
the other tenants residing on the premises.   Defendants also
raise a number of issues with respect to the adequacy of
Plaintiff's proof of causation.   Recognizing that this case has
been in this court for some time, resolution of these tort
issues, nevertheless, seems more appropriate for a Maryland

---

[7] Lest there be any doubt, the ability of a district court
to decline to exercise supplemental jurisdiction over remaining
state law claims exists whether the federal claims are
dismissed, for example, pursuant to a 12(b)(6) motion, or
whether they are disposed of by way of summary judgment.  *See,
e.g., Ashby v. Isle of Wight County School Bd.*, 354 F.Supp.2d
616, 631-32 (E.D.Va. 2004) ("[H]aving granted summary judgment
against Plaintiff on all the federal claims, the Court finds
that it does not have original jurisdiction over the remaining
claims asserted in Plaintiff's complaint, and that these claims
should be raised by Plaintiff in the courts of the Commonwealth
of Virginia."); *Zdziebloski v. Town of East Greenbush, N.Y.*, 336
F.Supp.2d 194, 207 (N.D.N.Y. 2004) ("Because summary judgment is
granted as to all federal law claims, the Court will not
exercise supplemental jurisdiction over the state law claims.");
*Ashton ex rel. Ashton v. Okosun,* 266 F.Supp.2d 399, 408 (D.Md.
2003) ("Having fully resolved the federal claims, the Court
declines to exercise supplemental jurisdiction over the state
law claims."); *Gregory v. Otac, Inc.*, 247 F.Supp.2d 764, 773
(D.Md. 2003) ("Since summary judgment in favor of defendants is
being granted as to all of plaintiff's federal claims, and since
there are no exceptional circumstances here, this Court will not
exercise pendent jurisdiction in this case over [the remaining
state law claim.]"); *Andrews v. Anne Arundel County, Md.*, 931
F.Supp. 1255, 1268 (D.Md. 1996) (remanding case to state court
after grant of summary judgment disposed of all federal claims,
the sole basis for removal).

state court.   Accordingly,  having  granted  summary  judgment
against  Plaintiff  on  the  federal  claim,  the  court  declines  to
exercise supplemental  jurisdiction over the remaining negligence
claims  and  will  remand  this  case  to  the  Circuit  Court  for
Montgomery County for resolution of those claims.

## V.   Conclusion

For  the  foregoing  reasons,  Defendants'  motion  for  summary
judgment  will  be  granted  as  to  count  I,  Plaintiff's  housing
discrimination  claim  under  the  FHA  (as  well  as  the  parallel
state  statute  and  county  code).    The  two  remaining  state  law
claims  for  negligence  will  be  remanded  to  state  court.    A
separate Order will follow.

_____/s/_____
DEBORAH K. CHASANOW
United States District Judge

August 3, 2005
